# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

MAY 1997 SESSION



**FILED**

**November 26, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 03C01-9608-CC-00299 |
| | ) | |
| vs. | ) | Blount County |
| | ) | |
| **SLATER BELCHER,** | ) | Hon. D. Kelly Thomas, Jr., Judge |
| | ) | |
| Appellant. | ) | (First Degree Murder, |
| | ) | Aggravated Assault) |

FOR THE APPELLANT:

KEVIN W. SHEPHERD
(on appeal and motion for new trial)
Attorney at Law
404 Ellis Ave.
Maryville, TN 37804

MACK GARNER (trial)
District Public Defender

NATALEE STAATS HURLEY (trial)
Assistant District Public Defender
318 Court Street
Maryville, TN 37804

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

SANDY R. COPOUS
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493

MIKE FLYNN
District Attorney General
Blount County Courthouse
Maryville, TN 37804

JERRY CUNNINGHAM
Attorney at Law
329 Cates St.
Maryville, TN 37801

OPINION FILED: _____

**AFFIRMED**

CURWOOD WITT
JUDGE

## OPINION

The defendant, Slater Belcher, stands convicted of the first degree murder of his best friend, Larry Wyatt, and the aggravated assault of his wife, Denise Belcher. His convictions were returned by a jury of his peers in the Blount County Circuit Court at the conclusion of a five day trial. The defendant is currently serving a life sentence for the murder conviction consecutively to a three year sentence for the aggravated assault. In this direct appeal, Belcher raises four issues for our review:

1. Whether he was denied his constitutional rights by defense counsel's failure to pursue any pretrial motions on his behalf, specifically including failure to move for the suppression of his pretrial statement to the police.

2. Whether his due process rights were violated by the state's failure to disclose information as required by Brady v. Maryland.

3. Whether he was deprived of a fair and impartial jury by the actions of the jury foreperson in concealing material information during voir dire.

4. Whether the evidence presented at trial is sufficient to support his convictions.

We affirm the judgment of the trial court.

In February 1995, the defendant and his wife, Denise Belcher, lived in and managed an apartment complex in Maryville. The defendant also owned a tractor-trailer truck and worked as a truck driver through Transis. The Belchers had several friends in their apartment complex, including Joan Huiet, who lived across the hall from them, and David Allen, a truck driver who was Ms. Huiet's occasional boyfriend. Larry Wyatt, a frequent visitor to the apartment complex, was a truck driver who Slater Belcher described as his best friend. Wyatt was, at the time of his death, engaged in an affair with the defendant's wife. He was also a former lover of Joan Huiet, although the two continued to maintain a close friendship.

At trial, the testimony of many of the principal witnesses was contradictory on key points.

**2**

Prior to February 26, 1995, the Belchers were experiencing marital difficulties. According to Mrs. Belcher, the marriage had reached the point where she was ready either for the defendant to leave or to leave herself. Mrs. Belcher knew the defendant was suspicious of her relationship with Wyatt, but so far as she knew, he had no definite knowledge of it. Unknown to Mrs. Belcher, Allen had confirmed the defendant's suspicions about the affair a few days before February 26, and Huiet had likewise confirmed the affair on February 25. Huiet testified the defendant was anxious over the situation prior to her conversation with him.

During the day of February 25, 1995, the Belchers argued, although Mrs. Belcher testified her husband did not then accuse her of having an affair with Larry Wyatt. Sometime in the afternoon or early evening hours, Mr. Belcher went to his mother's house in Powell so Mrs. Belcher could think about what the two needed to do about their relationship.

Within a few hours of the defendant's departure, Larry Wyatt arrived at the building. Wyatt agreed to take Huiet to the grocery store. While at the store, Huiet implored Wyatt to come clean with the defendant about his affair with Mrs. Belcher. Hueit informed Wyatt she had told the defendant about the affair between Mrs. Belcher and Wyatt and asked him to warn Mrs. Belcher. Huiet and Wyatt also devised a warning signal whereby Huiet would alert Wyatt of danger by telling him some flags she was supposed to pick up for him had not come in.

After Wyatt returned from the grocery store, he and Mrs. Belcher decided to go to his trailer home nearby. Before Mrs. Belcher left the building, she took her cordless phone to Huiet and asked Huiet to call her if the defendant returned home.

The defendant later returned and came to Huiet's apartment looking for the cordless phone. Huiet testified this occurred around 11:00 or 11:30 p.m.

3

According to Huiet, the defendant was upset because he had been stopped by a police officer on the way home. He asked Huiet whether she could get in touch with Mrs. Belcher. Huiet called the Wyatt home with the defendant standing at her side and confirmed that Mrs. Belcher was there.

Although Huiet's testimony is inconsistent on the sequence of events, at some point in the evening, she went across the hall to check on the defendant and found him sitting at the kitchen table with bullets and a gun. The two discussed the defendant's suspicions about his wife's affair with his best friend. The defendant was very upset and asked Huiet why this was happening and what was wrong with him. He took the bullets and threw them across the room, stating he had better get rid of them before he blew his brains out. He also took the gun and placed it on a high shelf in the kitchen. Huiet was so concerned about the defendant she suggested they go to the emergency room.

Within approximately 45 minutes of Huiet's first phone call to the Wyatt residence, the defendant requested she make a second phone call and tell Wyatt and Mrs. Belcher he was on his way home. Huiet testified the defendant wanted to get his wife and Wyatt back to the apartment complex so he could talk to them. Before she made the phone call, Huiet received the defendant's solemn word on his children's lives and his Masonic square that no harm would come to Wyatt or Mrs. Belcher. While talking with Wyatt, she relayed the "secret code" that his flags had not come in.

After making the call, Huiet went into her apartment to take a shower. She heard the defendant's Camaro crank up and leave. She recognized the car by its distinctive sound. Before she could intercept Wyatt and Mrs. Belcher,, she heard voices of the defendant and Mrs. Belcher. She could not make out the defendant's words, although she heard Mrs. Belcher say, "Nothing's going on" or "Oh, nothing." Next, she heard the defendant calling Wyatt out of hiding and accusing him of

behaving cowardly  The next thing Huiet knew, her door popped open and the defendant was yelling for Allen to help him carry Wyatt's body to the car.  Wyatt was lying on the floor just outside Huiet's doorway.  Huiet testified the defendant said, "I didn't mean to hurt him."  She denied making a previous statement that the defendant said, "I didn't mean to shoot him.  He jumped me."  Huiet claimed she had not heard a gunshot and did not realize the seriousness of the victim's injury.  Dressed in a nightgown, Huiet stepped over Wyatt's body in her doorway and ran out the back door to the apartment building, where she entered a taxi cab in which Mrs. Belcher was seated.  She testified Mrs. Belcher said, "He shot him."  She and Mrs. Belcher left the building in the cab, went to Allen's ex-wife's home, where Huiet borrowed some clothing, and Allen's ex-wife's boyfriend drove them back to the apartment building.

Denise Belcher testified that after receiving the second call from Huiet, she and Wyatt agreed to go back to the apartment building so she could "face the music" regarding her affair.  When they arrived, Mrs. Belcher did not see the Camaro, so she assumed the defendant was not yet home.  She and Wyatt went inside the building.  While they were in the hallway outside her apartment, she heard someone walking on her living room floor and knew her husband was home.  She looked back over her shoulder, but Wyatt was no longer behind her.  When she turned around, the defendant was in front of her.  The defendant was dazed and angry, and he demanded to know where she had been.  He was holding a stick, later determined to be an axe handle, in his hands.  The two walked into their apartment, and argued about Mrs. Belcher's whereabouts and activities, and the defendant hit Mrs. Belcher on her upper right arm with the stick.  The defendant went through the front door into the hallway.  Mrs. Belcher fled the apartment, running out the back door and jumping into a taxi cab that was dropping off a passenger at the building.  She admitted telling the cab driver her husband was going to hurt someone.  Huiet came to the door of the building and yelled for Mrs. Belcher to come back in.  Mrs. Belcher refused, and Huiet ran out to the taxi.  Mrs.

Belcher denied telling Huiet that the defendant shot Wyatt, although she admitted telling her someone was going to get hurt. She denied hearing a gunshot prior to leaving the building.

David Allen, a convicted felon on probation, was sleeping throughout the evening on Huiet's sofa. Both he and Huiet testified he is a very sound sleeper. Nevertheless, Allen testified he was awakened by the defendant earlier in the evening. The defendant had a stick and told Allen he was going to "talk to" Wyatt with it. Later, Allen was again awakened by the defendant, who asked him for help moving Wyatt's body. Wyatt was at this time lying face down in the doorway with his head to the side and a pool of blood by his head. Allen had not heard any of the preceding events, and did not realize Wyatt was dead. He helped the defendant carry Wyatt's body outside and load the body into the back seat of Wyatt's Camaro. The defendant told Allen to meet him at Kay's Ice Cream, which was a few blocks away. Allen went inside the building to get his keys and some clothing, then drove to Kay's. The defendant was in the parking lot waiting for Allen when he arrived. The defendant got into Allen's car, hit the dashboard very hard, and was "hyper." According to Allen, the defendant had been nervous and stressed out earlier in the day. The defendant handed Allen a baseball cap and a towel and asked him to get rid of them. Allen felt a gun wrapped up in the towel and realized the gravity of the situation. He took the defendant back to the apartment building, then went to a convenience store and threw the items the defendant had given him into a dumpster. Allen was concerned that he would be sent back to prison because of his involvement, so he went to a friend's house to ask him what to do. Within a short time, Allen alerted law enforcement of his knowledge of the crime.

Meanwhile, back at the apartment building, Huiet cleaned the floor in the hallway. She testified she did this because she spilled some of her medical supplies earlier in the evening. She denied noticing any blood, although Allen testified he had seen a pool of blood in the hallway after the body was moved.

6

Huiet said the hallway was "pitch black" and she could not see what she was doing.

The defendant, Mrs. Belcher and Huiet congregated in Huiet's apartment. Huiet demanded the defendant take her to Wyatt, and the three went to Kay's Ice Cream. Huiet went to Wyatt's vehicle and took several items from the body, including a trucker's log book, a dollar, some keys and a coat. According to Huiet, the defendant told his wife to look at Wyatt to see what she made him do. Mrs. Belcher denied her husband ever made this statement.

The defendant did not testify at trial, although his recorded statement was played for the jury. In the statement, the defendant said he came home from his mother's house and parked his car down the road because he wanted to sneak up to the apartment building to see with his own eyes whether his wife was having an affair with his best friend. Neither his wife nor Wyatt were there, although the two arrived sometime later. The defendant repeatedly insisted Wyatt's shooting had been an accident. He said he encountered Wyatt in the hall. Wyatt slapped him, and he went into his kitchen to get the gun to scare Wyatt. He intended no harm, although he wanted Wyatt to leave the apartment building. When he returned, Wyatt grabbed the defendant, which scared him. The defendant claimed, "I didn't mean to." He also claimed the gun was not supposed to have been loaded. Although the defendant admitted being upset at seeing his wife and best friend together as they entered the apartment building, he denied shooting Wyatt out of anger. The defendant claimed he attempted to help Wyatt by first looking for his cordless phone to call for help, and later attempting to drive him to UT Medical Center. The defendant claimed he abandoned the trip to the hospital when he realized his friend was not responsive. He left the car in a brightly lit parking lot and walked home to continue the search for his telephone to call for help. During the interrogation, he mentioned nothing of Allen's involvement in the disposal of evidence following the crime.

7

One of the few areas about which there was no controversy was whether the defendant had been upset prior to these crimes. Allen talked with the defendant the previous morning and observed that, although the defendant usually had a neat appearance, he looked as if he was about to have a nervous breakdown. Huiet made similar observations about the defendant being agitated and upset on the evening of February 25. Mrs. Belcher admitted she and the defendant argued during the day, and he was apparently agitated enough to use profanity. Mrs. Belcher also admitted her husband and Wyatt had quarreled a few nights earlier when Wyatt had knocked on Huiet's door looking for Mrs. Belcher.[1]

Brandi Presley, Denise Belcher's 14 year old daughter and the step-daughter of the defendant, testified she found a bag containing several items of the defendant's clothing and Wyatt's jacket behind the Belchers' waterbed. These items were turned over to the police.

Charles Sterling, a Maryville resident who lives near the apartment building, testified that at 2:00 a.m. on February 26, he saw someone park a car near his home. Then a shadowy figure walked away from it. Because he had experienced trouble with vandalism, he photographed the vehicle. When he learned of the crimes, he turned the negative over to the police. An enlargement of the negative revealed the vehicle to have a license tag number registered to the defendant. Mr. Sterling noticed the car was gone when he left at 5:00 a.m. Kelly Sterling, the wife of Charles Sterling, confirmed the time the car arrived.

Victoria O'Hara, a tenant of the apartment building, testified she awoke at 2:14 a.m. on the morning of February 26 when she heard a gunshot. She looked at her clock, then went back to sleep. A day or two later, she found a watch by the dumpster which she turned over to the police. The watch was identified by

---

[1]There was some evidence Wyatt used his friendship with Huiet as a "cover" for his affair with Mrs. Belcher.

Wyatt's son as belonging to his father.

Several law enforcement officers from the Blount County Sheriff's Department and the Maryville Police Department testified regarding their investigation of this case. Significantly, Maryville Detective David Graves found a blood smear on a wall in the Belcher apartment. Testing by the TBI lab later determined the blood was the same type as that of Wyatt. However, Graves admitted the defendant's blood had not been typed to determine whether he might be the source of the blood found in his apartment. Graves further testified that substances found on the steps and gravel outside the building, the towel recovered from the convenience store dumpster, and the defendant's clothing found behind the waterbed were human blood. The samples could not be typed, however, due to their age by the time they reached the TBI lab. Hairs found on the baseball cap recovered from the convenience store dumpster was scientifically determined to match Wyatt's hair.

Raymond Finney, M.D., the Blount County Medical Examiner, performed an autopsy of Wyatt's body. He determined that Wyatt's death resulted from a gunshot. Based on the lack of injury to the body from hot gases, powder burns or gun barrel contact, Dr. Finney opined the wound was not inflicted at close range.

Gerald Wilkes, an agent with the FBI, testified the .22 caliber weapon recovered from the dumpster was a single action revolver, a weapon that would have to be cocked and then the trigger depressed separately for each firing. He performed tests on the weapon and determined it was the weapon used to shoot Wyatt. He further determined there would be residue burns, called stippling or tattooing, on Wyatt's body or clothing if the weapon was fired from a distance of five feet or less. Chemical processing and microscopic examination of Wyatt's shirt revealed no evidence of stippling or tattooing.

9

Finally, the parties stipulated that if Blount County Sheriff's Deputy J.R. Johnson testified, he would say that he stopped the defendant driving a Camaro on Alcoa Highway traveling toward Maryville at 11:56 p.m.

## I

The first issue we are called upon to consider is whether the defendant has been denied his constitutional rights through trial counsel's failure to pursue pretrial motions on his behalf, including a motion to suppress his pretrial statement to the police. Essentially, this is an allegation of ineffective assistance of counsel. We note, however, the defendant failed to raise this issue in any of his three motions for a new trial. Therefore, the issue is waived. Tenn. R. App. P. 3(e); State v. Karl Christopher Davis, No. 01C01-9202-CC-00062, slip op. at 5 (Tenn. Crim. App., Nashville, Mar. 17, 1993).

Moreover, as we have repeatedly noted in the past, the practice of raising ineffective assistance of counsel claims on direct appeal without an evidentiary hearing having been conducted on the issue is "fraught with peril." See, e.g., State v. Anderson, 835 S.W.2d 600 (Tenn. Crim. App. 1992). In this case, the defendant failed to raise the issue in his motions for new trial and submitted no proof regarding counsel's performance. The trial court had no opportunity to make findings of fact on this issue. As such, it is inappropriate for us to consider the issue. Nevertheless, our abstention from considering the issue does not deprive the defendant of an opportunity to have this issue reviewed in an appropriate post-conviction proceeding if he so desires.

## II

Next, the defendant alleges his due process rights were violated because the state failed to disclose the identity of a witness and her allegedly exculpatory statement, contrary to the requirements of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). At the hearing on the motion for new trial, Elizabeth

**10**

Ostler testified she lived in the apartment building where the crimes occurred. She heard a loud bang between 1:30 and 2:00 a.m. on February 26. She reported this to Det. Graves later that morning while he was processing the crime scene. She also called him a couple of weeks later and reiterated the information. Greg Ostler confirmed his wife spoke with Det. Ostler on February 26. Detective Graves had no notes or independent recollection of speaking with Mrs. Ostler. He admitted he had a phone message from Mrs. Ostler but could not recall whether he spoke with her. The defendant contends Mrs. Ostler's statement is exculpatory because it contains evidence the gunshot was fired earlier in time than shown at trial, potentially inculpating Mrs. Belcher as the shooter. The state counters that the sequence of events, rather than the time of the gunshot itself is determinative in this case, and the Ostler evidence is only marginally material and not subject to Brady disclosure.

In Brady v. Maryland, the United States Supreme Court held that the prosecution has the duty to furnish exculpatory evidence to the accused upon request. Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97. The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. State v. Marshall, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992); Branch v. State, 4 Tenn. Crim. App. 164, 168, 469 S.W.2d 533, 536 (1969). In United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481 (1985), the Supreme Court held that both exculpatory and impeachment evidence fall under the Brady rule.

Before an accused is entitled to relief under this theory, he must establish several prerequisites: (a) the prosecution must have suppressed the evidence; (b) the evidence suppressed must have been favorable to the accused; and (c) the evidence must have been material. See Bagley, 473 U.S. at 674-75,

**11**

105 S. Ct. at 3379-80; Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97; Workman v. State, 868 S.W.2d 705, 709 (Tenn. Crim. App. 1993); State v. Marshall, 845 S.W.2d 228, 232; Strouth v. State, 755 S.W.2d 819, 828 (Tenn. Crim. App. 1986). In State v. Spurlock, 874 S.W.2d 602 (Tenn. Crim. App. 1993), this court recognized a fourth prerequisite to relief, that "the accused must make a proper request for the production of the evidence, unless the evidence, when viewed by the prosecution, is obviously exculpatory in nature and will be helpful to the accused." Spurlock, 874 S.W.2d at 609 (citations omitted).

Assuming the Ostlers' testimony is accepted as credible, we fail to see how this evidence is material. As the trial court found and the state posits, the sequence of events, not the actual time they occurred, is pertinent in this case. Additionally, the record is devoid of any evidence the defense requested Brady material.[2] In the absence of a request for exculpatory material, there has been a Brady violation only if the evidence in question is obviously exculpatory in nature. Mrs. Ostler's alleged statement to Det. Graves fails to meet this standard. Mrs. Ostler's testimony sheds no light on the critical sequence of events; she merely places a time on one of the events. The trial witnesses' and Mrs. Ostler's estimates of the time when the events occurred varied by as much as approximately two hours. None of the witnesses who estimated the time Mrs. Belcher and Huiet left the apartment building were able to give a precise answer. Because of the uncertainty of that evidence, Mrs. Ostler's statement cannot be viewed as contradicting the evidence actually presented and does not indicate that Mrs. Belcher or Huiet could be the killer because they were still in the apartment building when Wyatt was shot.[3] There has been no Brady violation.

---

[2]The defendant contends in his brief that a discovery request was made; however, no request appears of record. Unsupported assertions of counsel do not suffice as evidence in this court.

[3]We are not unmindful that the defendant's position that his wife or Huiet may have committed the crime is belied by the confession he gave the investigating officers in the hours following the crime, in which he said, "I didn't mean to" and repeatedly insisted Wyatt's death was an accident.

The defendant next claims he was denied a fair trial because during voir dire the jury foreperson concealed material information regarding her knowledge of the case. The state argues there was no intentional failure to disclose, nor was there any concealment or misrepresentation of information bearing on impartiality.

Challenges to juror qualifications generally fall into two categories at common law -- propter defectum or propter affectum. Partin v. Henderson, 686 S.W.2d 587, 589 (Tenn. App. 1984). Objections based on general disqualifications, such as alienage, family relationship or statutory mandate, are classified as propter defectum and must be challenged prior to the return of the jury verdict. State v. Akins, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). On the other hand, objections based on bias, prejudice or partiality toward a party are classified as propter affectum. Durham v. State, 182 Tenn. 577, 582, 188 S.W.2d 555, 559 (Tenn. 1945). Propter affectum challenges may be made after the return of the jury verdict. State v. Furlough, 797 S.W.2d 631, 652 (Tenn. Crim. App. 1990).

The party alleging juror bias or partiality bears the burden of proof on the issue. See State v. Taylor, 669 S.W.2d 694, 700 (Tenn. Crim. App. 1983). When a juror wilfully conceals or fails to disclose information which calls into question her impartiality, a presumption of prejudice arises. Durham, 182 Tenn. at 584, 188 S.W.2d at 559; see Hyatt v. State, 221 Tenn. 644, 646, 430 S.W.2d 129, 130 (Tenn. 1967) (silence on an issue considered a negative response).

The evidence regarding the juror in question, Debbie Mills, was developed at the hearing on the motion for new trial. Mrs. Mills is married to a truck driver, Russell Mills, who works for Transis. The defendant also worked for this company. Mr. Mills previously worked at Service Way, another trucking company, for a brief time with Larry Wyatt. The defendant also worked for Service Way,

although he left before Mr. Mills was hired. On the evening before jury selection began, the Millses ate dinner at a Shoney's restaurant with Robert and Angie Hubbard. Mr. Hubbard is the owner of Hubbard Trucking. Hubbard Trucking leases its services to Transis. The Hubbards knew the defendant. During dinner, Mrs. Mills mentioned that she had been summoned for jury duty the following day. Mr. Hubbard mentioned that the defendant's trial was scheduled to start the next day. Mrs. Hubbard claims Mr. Mills responded by saying, "Yeah, you know Slater Belcher," to his wife, while the Millses deny this. Mrs. Mills claims the defendant's name meant nothing to her. According to Mrs. Hubbard, Mrs. Mills also said she had always wanted to serve on a jury in a murder trial.

Mr. Mills also testified he heard some rumors at work about one truck driver shooting another. He told his wife about these rumors, although he did not know the names of those involved. Mrs. Mills recalled her husband telling her one trucker from Service Way "supposedly" shot another trucker from Service Way.[4] She testified she was unaware a fatality resulted, and she had not followed the case in the newspaper.

Mrs. Mills testified she gave truthful answers to all of the questions posed during voir dire. She further testified she based her verdict on the evidence she heard in the courtroom.

In resolving this issue against the defendant, the lower court obviously accredited the testimony of Mr. and Mrs. Mills over that of Mrs. Hubbard, which was its prerogative to do as the finder of fact. Thereby, the court accepted the state's

---

[4]With the consent of the state, the defendant presented an affidavit of Jimmy Wilkerson, alleging Wilkerson was the vice president of operations of Service Way Motor Freight, Inc., in which capacity he was the custodian of the company's business records. According to those records, Slater Belcher was employed by Service Way from April 4, 1990 until May 21, 1993. Russell Mills was employed from June 13, 1994 until August 25, 1995, and he worked for Service Way through a temporary agency prior to his term of employment. Larry Wyatt was employed from October 30, 1992 until July 28, 1994, after which time he purchased his own truck, which he parked on Service Way's premises.

evidence as rebutting the presumption of bias. In this case, we are required to give the findings of fact made by the trial court the weight of a jury verdict. See State v. Burgin, 668 S.W.2d 668 (Tenn. Crim. App. 1984). We cannot reverse the holding unless the evidence clearly preponderates against the trial court's conclusion that the juror acted without bias and performed her duties with impartiality. In this case, the evidence does not preponderate against the conclusion of the trial court. Having accepted the Millses as credible, the court reached the correct conclusion. This issue is without merit.

## IV

Finally, the defendant challenges the sufficiency of the evidence supporting his two convictions. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate

view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

Moreover, a criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237 (Tenn. 1973); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Lequire, 634 S.W.2d 608 (Tenn. Crim. App. 1987). However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610 (1971); Jones, 901 S.W.2d at 396. In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613; State v. McAfee, 737 S.W.2d 304, 305 (Tenn. Crim. App. 1987).

1.    First Degree Murder

On February 26, 1995, the definition of first degree murder was "[a]n intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202 (1991) (amended 1995). In this case, the state presented circumstantial evidence which, if accepted by the trier of fact, sufficiently supports the defendant's conviction of first degree murder of Larry Wyatt. Prior to Wyatt's death, the defendant expressed his intent to "talk to" Wyatt with an axe handle. He lured Wyatt to the apartment building. While waiting for Wyatt to arrive, the defendant hid his car down the street. The jury could logically infer the defendant was laying a trap for Wyatt. According to the defendant's statement, he was upset over his wife's affair with Wyatt. After Wyatt arrived, Wyatt hit the defendant. Belcher did not respond immediately, but retreated to his apartment, got a gun, and shot Wyatt from a distance of at least five feet. The evidence strongly supports the conclusion the defendant and the victim were alone at the time of the shooting. The officers who

**16**

interrogated the defendant repeatedly referred to the defendant having shot Wyatt, and in the course of giving a full statement, the defendant never denied he was the shooter. The defendant admitted, "I didn't mean to," and repeatedly stated, "It was an accident." He made a similar statement to Huiet immediately after the crime. A rational trier of fact could easily interpret these statements as confessions of guilt.

While the defendant interprets the evidence much differently, we must adhere to a review in the light most favorable to the state. Moreover, we are constrained not to consider the defendant's wife's testimony at the hearing on the motion for new trial in our review of this issue, as the defendant would have us do. At that hearing, Mrs. Belcher testified she knew her husband had not shot Wyatt and then asserted her Fifth Amendment privilege when asked how she knew this. We are limited to consideration of the evidence presented to the jury. If the defendant has new evidence that was not available at trial, he may apply to the trial court for a Writ of Error Coram Nobis. See generally Tenn. Code Ann. §§ 27-7-101 to -108 (1980).

2.      Aggravated Assault

Aggravated assault, as indicted in this case, is knowingly causing bodily injury to another through the use of a deadly weapon. Tenn. Code Ann. § 39-13-102 (1991). The defendant argues the state's evidence was insufficient to prove the axe handle qualified as a deadly weapon and that he committed the crime knowingly.

According to the criminal code, "'Deadly weapon' means: (A)  A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury, or (B)  Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]" Tenn. Code Ann. § 39-11-106(5) (Supp. 1996). "Serious bodily injury" results from bodily injury

**17**

involving "(A)  A substantial risk of death; (B)  Protracted unconsciousness; (C) Extreme physical pain; (D)  Protracted or obvious disfigurement; or (E)  Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty."  Tenn. Code Ann. § 39-11-106(33) (Supp. 1996).

In this case, the state exhibited the axe handle to the jury.  The state offered further proof through photographs of the injury that resulted to Mrs. Belcher's arm after only one blow from the axe handle.  One of the photographs shows Mrs. Belcher's upper left arm with a solid purple/blue bruise extending completely across her arm from side to side and extending from a few inches below her shoulder at least five to six inches down toward her elbow.  From this evidence, the jury could reasonably conclude the axe handle was capable of causing death or serious bodily injury by the manner of its use.  Cf.  State v. David Lee Dycus, No. 1, slip op. at 4 (Tenn. Crim. App., Jackson, Oct. 24, 1990) (a large stick and martial arts fighting sticks considered deadly weapons).

We find no error in the defendant's conviction of aggravated assault.[5]

The judgment of the trial court is affirmed.

_____
CURWOOD WITT, JUDGE

CONCUR:

_____
JOSEPH B. JONES, PRESIDING JUDGE

_____

[5]The appellant makes a cursory allegation attacking the sufficiency of the knowing element of the aggravated assault conviction.  This allegation is less than one sentence long and contains no argument or citations.  Because the defendant has failed to present his case, he has waived our consideration of the issue.  See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

_____
JOSEPH M. TIPTON, JUDGE